UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WAYNE COVER,

                   Plaintiff,

      - *against* -

AMERICAN POSTAL WORKERS UNION, AFL-CIO,
et. al.,

                   Defendants.

**05 Civ. 2430 (LMS)**

**DECISION AND ORDER**

       This matter is before me for all purposes including trial on consent of the parties in accordance with the provisions of 28 U.S.C. § 636(c).  Plaintiff Wayne Cover ("Plaintiff"), a former part-time flexible mail processor with the United States Postal Service (the "Postal Service" or "Employer"), brings this "hybrid" action under the Labor Management Relations Act of 1947, 29 U.S.C. § 185 ("LMRA"), and the Postal Reorganization Act, 38 U.S.C. § 1208(b) ("PRA"), against John E. Potter ("Potter"), Postmaster General of the Postal Service, and the American Postal Workers' Union ("APWU" or "Union").  Specifically, Plaintiff claims that: (1) the Union breached its duty of fair representation when it entered into a settlement agreement (the "Agreement") that was against Plaintiff's best interests; and (2) the Postal Service breached the Collective Bargaining Agreement ("CBA") when it issued Plaintiff a letter of warning (the "LOW") without just cause.  The Union and Potter (collectively, the "Defendants") now separately move for summary judgment pursuant to Rule 56 (collectively, the "Motions"), requesting dismissal of the Complaint in its entirety.  For the following reasons, I find that the Motions should be granted in their entirety.

## I.     BACKGROUND

### A.     <u>Relevant Facts</u>[1]

#### 1.     ***Plaintiff's Employment with the Postal Service***

Plaintiff began working as a part-time flexible mail processor for the Postal Service in November 1997, and shortly thereafter became a member of the Union.  <u>See</u> Complaint at ¶¶ 7 and 9; Potter's 56.1 Statement at ¶ 4; Plaintiff's Response to Potter's 56.1 Statement at ¶ 4. Plaintiff was initially assigned to the White Plains Post Office, and was responsible for processing mail manually, as well as on a delivery bar code sorter machine ("DBCS").  Potter's 56.1 Statement at ¶ 4; Plaintiff's Response to Potter's 56.1 Statement at ¶ 4; the Declaration of Wendy H. Waszmer ("Waszmer.Decl.") at Exhibit B ("Plaintiff's Deposition") at 29-30.  In October 2000, Plaintiff was transferred to the Westchester Processing Distribution Center in Harrison, where he worked until his employment with the Postal Service ended on or about August 4, 2004.  Plaintiff's Deposition at 31-32 and 37-38; Union's 56.1 Statement at ¶ 3; Plaintiff's Response to the Union's 56.1 Statement at ¶ 3.

---

[1] The following facts are taken from: (1) the Complaint; (2) Potter's Motion for Summary Judgment and accompanying Local Rule 56.1 Statement of Material Facts ("Potter's 56.1 Statement"); (2) the Union's Motion for Summary Judgment and accompanying Local Rule 56.1 Statement of Facts ("Union's 56.1 Statement"); (3) Plaintiff's Memorandum of Law in Opposition to Defendants Potter and APWU's Motions for Summary Judgment ("Plaintiff's Opposition"), as well as Plaintiff's Statement of Disputed Facts in Response to Potter's 56.1 Statement ("Plaintiff's Response to Potter's 56.1 Statement") and Plaintiff's Statement of Disputed Facts in Response to the Union's 56.1 Statement ("Plaintiff's Response to the Union's 56.1 Statement"); (4) Potter's Reply Memorandum of Law ("Potter's Reply"); (5) the Union's Reply Memorandum of Law ("Union's Reply"); and (6) the evidence submitted by the parties in support of their submissions, including deposition testimony and affidavits.  The facts contained in this section are uncontested unless otherwise noted, and are construed in the light most favorable to Plaintiff, the non-moving party.

2.      *The Relevant Sections of the CBA*

Article 7

Pursuant to Article 7 of the Collective Bargaining Agreement between the Postal Service

and the American Postal Workers Union, AFL-CIO, 200-2003 (the "CBA" or the "National

Agreement"), part-time employees "shall be hired pursuant to such procedures as the Employer

may establish and shall be assigned to regular schedules of less than forty (40) hours in a service

week, or shall be available to work flexible hours as assigned by the Employer during the course

of a service week."  See Potter 56.1 Statement at ¶ 1; Plaintiff's Response to Potter's 56.1

Statement at ¶ 1; the Declaration of Wendy H. Waszmer ("Waszmer.Decl.") at Exhibit A (a copy

of Articles 7, 15, and 15 of the CBA).

Article Sixteen

Article 16 of the CBA, entitled "Discipline Procedure," outlines the procedures regarding

the issuance of employee discipline.  It states, in relevant part:

> In the administration of this Article, a basic principle shall be that discipline should be
> corrective in nature, rather than punitive.  No employee may be disciplined or discharged
> except for just cause such as, but not limited to, insubordination, pilferage, intoxication
> (drugs or alcohol), incompetence, failure to perform work as requested, violation of the
> terms of this Agreement, or failure to observe safety rules and regulations.  Any such
> discipline or discharge shall be subject to the grievance-arbitration procedure provided
> for in this Agreement, which could result in reinstatement and restitution, including back
> pay.

Waszmer.Decl., Exhibit A at 109-110.  Article 16 also sets forth progressive forms of discipline

that are recognized under the CBA.  The lowest form of discipline is a letter of warning, which is

a "disciplinary notice in writing, identified as an official disciplinary letter of warning, which

shall include an explanation of a deficiency or misconduct to be corrected."  Waszmer.Decl.,

Exhibit A at 110.  More serious forms of discipline that are available under the CBA include:

3

(1) suspensions of 14 days or less (Waszmer.Decl., Exhibit A at 110); (2) suspensions of more than 14 days or discharge (id. at 111); and (3) indefinite suspension (id. at 112).

Article 15

Article 15 of the CBA sets forth procedures for handling grievances filed by Postal Service employees.  A grievance is defined in the CBA as "a dispute, difference, disagreement or complaint between the parties related to wages, hours, and conditions of employment." Waszmer.Decl., Exhibit A at 90.  The CBA's grievance process consists of four steps and arbitration, and opportunity for mediation.  Waszmer.Decl., Exhibit A at 90-109; Union's 56.1Statement at ¶ 6.  The local union represents the grievant at Steps One and Two, and the Union becomes involved only if the grievance progresses to Step Three or beyond.  Union 56.1 Statement at ¶ 15; Plaintiff's Response to the Union's 56.1 Statement at ¶ 15.  The grievant may request arbitration at Step Three of the grievance process.  Waszmer.Decl., Exhibit A at 94-97; Waszmer.Decl., Exhibit D ("Yannuzzi Deposition") at 6 and 19.  The CBA clearly states that in all four steps of the grievance process, the union representative "shall have authority to settle or withdraw a grievance in whole or in part."[2]  See Waszmer.Decl., Exhibit A at 91, 92, 96, and 97; Union's 56.1 Statement at ¶ 6; see also Yannuzzi Deposition at 13-15.

### 3.      *Employers' Disciplinary Actions against Plaintiff*

Beginning in 2002, the Postal Service issued a series of disciplinary actions against Plaintiff, beginning with the LOW issued to Plaintiff on November 11, 2002.  Complaint at ¶ 10.

---

[2] The Union states that it is undisputed that the CBA does not require a representative of the Union to consult the grievant prior to settling grievances.  Union 56.1 Statement at ¶ 6. Plaintiff agrees with this statement, but adds that the CBA "does not prohibit the same." Plaintiff's Response to the Union's 56.1 Statement at ¶ 6.

The LOW charged Plaintiff with:  (1) failure to follow instructions; and (2) leaving his assigned work area without permission during his shift on November 9, 2002.  Waszmer.Decl. at Exhibit C; Cover Deposition at 49.  Specifically, the LOW stated that "at 7:15 a.m. [Plaintiff] left [his] assigned DBCS machine prior to finalizing all of the mail. . . . [Plaintiff] did not notify a supervisor prior to leaving the operation, and instead, [Plaintiff] left [his] assigned work area without permission."  Waszmer.Decl. at Exhibit C; Cover Deposition at 51.

Less than three months later, on February 8, 2003, a notice of seven day suspension (the "7-Day Notice") was issued to Plaintiff for the same behavior he was charged with in the LOW – failure to follow instructions and failure to remain in his assigned work area.  Union's 56.1 Statement at ¶ 9; Plaintiff's Response to the Union's 56.1 Statement at ¶ 9.  The LOW was clearly referenced in the 7-Day Notice, which stated that the Employer considered the LOW in arriving at the decision to issue the 7-Day Notice.  Waszmer.Decl. at Exhibit G.

Less than five months after issuing the 7-Day Notice, the Postal Service again disciplined Plaintiff by issuing him a notice of fourteen day suspension (the "14-Day Notice") on May 22, 2003, for his failure to perform assigned duties during his shift on May 16, 2003.  Declaration of Josephine Escalante ("Escalante.Decl.") at Exhibit L.  In the 14-Day Notice, the Postal Service cited to both the LOW and the 7-Day Notice, stating that it considered both disciplinary actions in reaching its decision to suspend Plaintiff for fourteen days.  Id.  Plaintiff filed grievances with respect to all three of the above-mentioned disciplinary actions (hereinafter the "LOW grievance," "seven day grievance" and "fourteen day grievance," respectively).

### 4.    *The Agreement*

On April 11, 2003, National Business Agent Louise Yannuzzi met with James Kirk ("Kirk"), Manager of Labor Relations ("Management"), to conduct a review of pending grievances at the Westchester Facility.[3]  Potter's 56.1 Statement at ¶ 11; Plaintiff's Response to Potter's 56.1 Statement at ¶ 11; Yannuzzi Deposition at 20; Waszmer.Decl. at Exhibit E ("Kirk Deposition") at 35-36.  At the review session on April 11, 2003, Kirk, on behalf of the Postal Service, made an offer to settle the LOW grievance by promising to expunge the LOW grievance within one year, provided that Plaintiff received no further disciplines during the one year time period.  Potter's 56.1 Statement at ¶ 12; Plaintiff's Response to Potter's 56.1 Statement at ¶ 12; Kirk Deposition at 18-21; Yannuzzi Deposition at 13-25.

At her deposition, Yannuzzi testified that prior to signing Kirk's proposed settlement offer, she checked Plaintiff's grievance history with the assistance of a Management employee named Tina Weil ("Weil"),[4] who had access to the "GATS" database.  Potter's 56.1 Statement at ¶ 13; Plaintiff's Response to Potter's 56.1 Statement at ¶ 13; Yannuzzi Deposition at 20-21. Yannuzzi further testified that Weil's check of Plaintiff's grievance history on GATS showed that he had "nothing pending" beyond the LOW grievance.  Id.  In addition, Yannuzzi stated that she personally saw Weil's computer screen when Weil pulled up Plaintiff's history on GATS, and therefore Yannuzzi was able to personally confirm that "there was nothing on the screen for

---

[3] Yannuzzi testified that she regularly met with Management to review cases that are "headed for arbitration" in an effort to resolve as many cases as possible before arbitration. Yannuzzi Deposition at 16-18 ("[The reviews] are just an extra step in the grievance process to try to resolve as many cases as you can").

[4] Yannuzzi was "almost positive" that she asked labor relations employee Tina Weil. Yannuzzi Deposition at 20-22.

[] Mr. Cover." Yannuzzi Deposition at 32 and 55. Yannuzzi always consulted GATS when she handled settlement proposals that, like the Agreement in the instant case, made expungement of a discipline contingent on the employee receiving no further disciplinary action for a period of time. See Union's 56.1 Statement at ¶ 16; Plaintiff's Response to the Union's 56.1 Statement at ¶ 16.

As a result of Weil's search of the GATS database, Yannuzzi believed that Kirk's proposed settlement was a "good offer," as "it was only seven months to go" before the LOW would be expunged. Potter's 56.1 Statement at ¶ 16; Plaintiff's Response to Potter's 56.1 Statement at ¶ 16. Thus, Yannuzzi accepted Kirk's offer to settle the LOW grievance and signed the settlement document. Potter's 56.1 Statement at ¶ 14; Plaintiff's Response to Potter's 56.1 Statement at ¶ 14; see Waszmer.Decl. at Exhibit F. However, Plaintiff had, in fact, been issued a subsequent discipline, the 7-Day Notice issued to Plaintiff in February 2003. Potter's 56.1 Statement at ¶ 15; Plaintiff's Response to Potter's 56.1 Statement at ¶ 15. If Yannuzzi had been aware that Plaintiff received the 7-Day Notice subsequent to the LOW, then she would not have entered into the Agreement. Union's 56.1 Statement at ¶ 19; Plaintiff's Response to the Union's 56.1 Statement at ¶ 19; Potter's 56.1 Statement at ¶ 17; Plaintiff's Response to Potter's 56.1 Statement at ¶ 17.

### 5. *Arbitration of the Seven Day Grievance*

On December 7, 2004, the seven day grievance proceeded to arbitration, over which Arbitrator Joseph Parker (the "Arbitrator") presided. Union's 56.1 Statement at ¶ 20; Plaintiff's Response to Union's 56.1 Statement at ¶ 20. The Arbitrator sustained the seven day grievance in part, and denied it in part, and ordered that the 7-Day Notice be reduced to a five day suspension.

Escalante.Decl. at Exhibit Q.

### B.    Procedural History

Plaintiff initiated the instant action by filing a Complaint in this Court on February 28,

2005.  Docket entry 1.  On May 9, 2005, Potter Answered the Complaint (docket entry 8), and

the Union filed a Motion to Dismiss the Complaint, or alternatively for summary judgment, in

lieu of an Answer.  Docket entries 22-26.  By Decision and Order dated August 26, 2005, the

Undersigned converted the Union's Motion to Dismiss to a Motion for Summary Judgment and

denied the Union's Motion in its entirety.  Docket entry 28.  Shortly thereafter, on September 9,

2004, the Union Answered the Complaint.  Docket entry 29.

On April 7, 2006, the Defendants received permission from the Court to serve and file

motions for summary judgment, no later than May 5, 2005.  The Defendants timely filed separate

motions for summary judgment (see docket entries 32-24 and 36-40 respectively), and Plaintiff

filed his opposing papers on June 5, 2006.  See docket entries 41-45.  The Defendants filed

separate replies on June 14, 2006.  See docket entries 46-48.

## II.    DISCUSSION

### A.    The Standard for Dismissal Pursuant to Summary Judgment under Rule 56 of the Federal Rules of Civil Procedure

Under the Federal Rules of Civil Procedure, summary judgment "shall be rendered

forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v.

Catrett, 477 U.S. 317, 320-23 (1986).  "Upon any motion for summary judgment pursuant to Rule

56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a

separate, short, and concise statement, in numbered paragraphs, of the material facts as to which

the moving party contends there is no genuine issue to be tried.  Failure to submit such a

statement may constitute grounds for denial of the motion."  Local Civ. R. 56.1(a).  A dispute

about a material fact is "genuine" if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A

trial judge may, therefore, grant summary judgment only if there is no genuine issue as to any

material fact and if the moving party is entitled to judgment as a matter of law.  See Anderson,

477 U.S. at 250.  The inquiry performed is the threshold inquiry of determining whether there are

any genuine factual issues that properly can be resolved only by a finder of fact.  Id.

Where a properly supported motion for summary judgment is made, the adverse

party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P.

56.  Under Local Rule 56.1(b), "the papers opposing a motion for summary judgment shall

include a correspondingly numbered paragraph responding to each numbered paragraph in the

statement of the moving party, and if necessary, additional paragraphs containing a separate, short

and concise statement of the material facts as to which it is contended that there exists a genuine

issue to be tried."  Local Civ. R. 56.1(b).  In addition, "[e]ach statement *by the movant or*

*opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement*

of material fact, must be followed by citation to evidence which would be admissible, set forth as

required by Federal Rule of Civil Procedure 56(e)."  Local Civil Rule 56.1(d) (italics in original).

Summary judgment may be granted only "[i]f after discovery, the nonmoving party 'has

failed to make a sufficient showing on an essential element of [its] case with respect to which [it]

has the burden of proof.' "  Berger v. United States, 87 F.3d 60, 65 (2d Cir. 1996) (quoting

9

Celotex, 477 U.S. at 323) (alteration in original).  "The nonmoving party must have 'had the opportunity to discover information that is essential to his [or her] opposition' to the motion for summary judgment."  Trebor Sportswear Co. v. The Limited Stores, Inc., 865 F.2d 506, 511 (2d Cir.1989) (quoting Anderson, 477 U.S. at 250 n. 5).  Moreover, a court should "constru[e] the evidence in the light most favorable to the nonmoving party and draw[] all reasonable inferences in its favor."  Mount Vernon Fire Ins. Co. v. Belize NY, Inc., 277 F.3d 232, 236 (2d Cir. 2002); Farias v. Instructional Sys., Inc., 259 F.3d 91, 97 (2d Cir. 2001); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 764 (2d Cir. 1998); see also Anderson, 477 U.S. at 261 n.2.  Thus, "[o]nly when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted."  Cruden v. Bank of New York, 957 F.2d 961, 975 (2d Cir. 1992) (quoting H.L. Hayden Co. of New York, Inc. v. Siemans Med. Sys. Inc., 879 F.2d 1005, 1011 (2d Cir. 1989)).

### B.     Jurisdiction

Plaintiff brings the instant action under § 301 of the LMRA and § 1208(b) of the PRA.  The PRA provides for jurisdiction of district courts over "[s]uits for violation of contracts between the Postal Service and a labor organization representing Postal Service employees . . . ."  39 U.S.C. § 1208(b).  This language tracks the language in § 301(a) of the LMRA, 29 U.S.C. § 185(a), the statutory analogue of §1208(b).  See American Postal Workers Union, AFL-CIO v. U.S. Postal Service, 766 F.2d 715, 720 (2d Cir. 1985), cert. denied, 475 U.S. 1046 (1986) (citing National Assoc. of Letter Carriers, AFL-CIO v. Sombrotto, 449 F.2d 915, 918-919 (2d Cir. 1971)).  Thus, the case law that governs actions brought under § 301 of the LMRA also governs claims brought by Postal Service employees under § 1208(b) of the PRA.  See Bowen v. U.S.

10

Postal Service, 459 U.S. 212, 232 & n.2 (1983).

### C.      Plaintiff's Hybrid Claim

A hybrid action formally consists of two separate causes of action.  See DelCostello v. Int'l Brotherhood of Teamsters, 462 U.S. 151, 164 (1983).  The first cause of action is against the employer for breach of the collective bargaining agreement, and is governed by § 301 of the LMRA.  Id.  The second cause of action is against the union for breach of its duty of fair representation, which is implied under the scheme of the National Labor Relations Act.  Id. " 'Yet the two claims are inextricably interdependent.' "  Id.  at 164-165 (citations omitted).  "The employee may, if he [or she] chooses sue one defendant and not the other; but the case he [or she] must prove is the same whether he [or she] sues one, the other, or both."  Id. at 165.  Thus, to prevail on a hybrid claim, an employee plaintiff must demonstrate both that:  (1) the employer breached the terms of the CBA; and (2) the union breached its duty of fair representation. Sanozky v. Int'l Assoc. of Machinists and Aerospace Workers, 415 F.3d 279, 282 (2d Cir. 2005) (citing Delcostello, 462 U.S. at 164-165).

As a threshold matter, an employee plaintiff must establish that the union breached its duty of fair representation in its handling of his or her grievance, as establishing the union's breach is a prerequisite to consideration of the merits of a plaintiff's claim against his or her employer.  See Young v. U.S. Postal Service, 907 F.2d 305, 307 (2d Cir. 1990) (citing DelCostello, 462 U.S. at 164-165); see also Acosta v. John E. Potter, Postmaster General of the U.S. Postal Service, 410 F.Supp.2d 298, 309 (S.D.N.Y. 2006) (citing Young, 907 F.2d at 307); Kavowras v. New York Times Co., 00 Civ. 5666 (HB), 2004 WL 1672473, at *6 (S.D.N.Y. 2004) ("Where, 'it is shown that the union fairly represented the employee, the suit against the employer

cannot stand.' "). (citations omitted).  An employee plaintiff must prove two elements to establish a duty of fair representation claim.  Barr v. United Parcel Service, 868 F.2d 36, 43 (2d Cir. 1989). First, the employee plaintiff must prove that the union's conduct was "arbitrary, discriminatory or in bad faith."  Id. (citing Vaca v. Sipes, 386 U.S. 171, 190 (1967) (internal quotation marks omitted).  Second, the union's actions must have "seriously undermine[d] the arbitral process." Id. (citing Hines v. Anchor Motor Freight, Inc. 424 U.S. 554, 567 (1976) (internal quotation marks omitted) (alternation in original).  However, "[a]ny substantive examination of a union's performance [] must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities."  Air Line Pilots Assoc. Int'l v. O'Neill, 499 U.S. 65, 78 (1991) (citations omitted).

　　　Under the first prong of the test, a union's actions are arbitrary if "in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' [], as to be irrational."  O'Neill, 499 U.S. at 67.  In the Second Circuit, "arbitrary conduct amounting to a breach is not limited to intentional conduct by union officials but may include acts of omission which, while not calculated to harm union members, 'may be so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary.' "  NLRB v. Local 282, 740 F.2d 141, 147 (2d Cir. 1984) (citations omitted).  "A union acts in bad faith when it acts with an improper intent, purpose, or motive. . . . [] Bad faith encompasses fraud, dishonesty, and other intentionally misleading conduct."  Spellacy v. Airline Pilots Assoc. Int'l, 156 F.3d 120, 126 (2d Cir. 1998) (citations omitted); but see NLRB, 740 F.2d at 148 & n. 13 ("We do not agree that a showing of bad faith is a prerequisite for establishing the existence of a breach. . . .  While it certainly is a

sufficient condition, it is not a necessary one.") (citing Jones v. Trans World Airlines, 495 F.2d 790, 798 (2d Cir. 1974)).  "Discriminatory conduct can be established by a showing of substantial evidence of discrimination that is 'intentional, severe and unrelated to legitimate union objectives. . . .'" Blossomgame v. New York's Health and Human Service Union, CV 02-1594 (EBB), 2004 WL 2030285, at *8 (E.D.N.Y. 2004) (citing Amalgamated Ass'n of St., Elec., RY & Motor Coach Employees of am v. Lockridge, 403 U.S. 274, 301 (1971)).  Moreover, [t]actical errors are insufficient to show a breach of the duty of fair representation; even negligence on the union's part does not give rise to a breach."  Barr, 868 F.2d at 43.  "[P]roof of mere negligence or errors of judgment on the part of the union is insufficient."  Cook v. Pan American World Airways, Inc., 771 F.2d 635, 645 (2d Cir.1985) (overruled on other grounds).  " 'As long as the union acts in good faith, courts cannot intercede on behalf of employees who may be prejudiced by rationally founded decisions which operate to their particular advantage.' " Id. (citations omitted).

"The second prong of the test is essentially a causation requirement whereby the plaintiff must establish a 'causal connection between the union's wrongful conduct and [his or her] injuries.' "  Blossomgame, 2004 WL 2030285, at *8 (citing White v. White Rose Food, 237 F.3d 174, 179 (2d Cir. 2001); Spellacy, 156 F.3d at 126 )).

"To survive a motion for summary judgment, a plaintiff alleging a breach of the duty of fair representation must 'set forth concrete, specific facts from which one can infer a union's hostility, discrimination, bad faith, dishonesty or arbitrary exercise of discretion.' " Gold v. Local Union No. 888, 758 F.Supp. 205, 208 (S.D.N.Y. 1991) (citations omitted).  Plaintiff claims that the Union breached its duty of fair representation in this case by:  (1) entering into the Agreement, which was against his best interest, without his knowledge or consent (Complaint at ¶

21); (2) failing to investigate Plaintiff's disciplinary history before entering into the Agreement (Plaintiff's Opposition at 2; see generally Complaint); and (3) falsely representing to Plaintiff that the LOW had been expunged from his record when, in fact, it had been settled by way of the Agreement in April 2003 (Complaint at ¶¶ 20 and 23). Plaintiff further claims that the Union's decision to settle the LOW instead of going to arbitration caused him to "lose" the seven day grievance. Plaintiff's Opposition at 15; see Complaint at ¶¶ 24 and 25. Specifically, Plaintiff claims that but for the Union's alleged breach, the Arbitrator of the seven day grievance would have, "at worst," issued a letter of warning to Plaintiff. Complaint at ¶ 25.

The Defendants argue that Plaintiff's claim against the Union should be dismissed, as there has been no evidence presented to show that the Union's decision to settle the LOW grievance was arbitrary, or discriminatory, or in bad faith. Potter's Memorandum of Law in Support of his Motion for Summary Judgment ("Potter's Memorandum") at 16-20; Memorandum of Law in Support of Defendant Union's Motion for Summary Judgment ("Union's Memorandum") at 10-16. Both Defendants concede that Yannuzzi erred when she entered into the Agreement based on her mistaken belief that Plaintiff had not been formally disciplined since the LOW was issued in November 2002, but argue that her error did not rise to the level of a breach of the duty of fair representation.

Separately, Potter argues that Plaintiff's claims that the Union breached its duty of fair representation by entering into a settlement that was prejudicial to Plaintiff's interests, and by allegedly concealing the Agreement from Plaintiff, are without merit. Specifically, Potter argues that Plaintiff cannot establish that the Union's conduct was arbitrary by claiming that the Agreement was a "bad settlement" (citing O'Neill, 499 U.S. at 79; White, 237 F.3d at 179), as

14

Plaintiff has failed to present facts to dispute Yannuzzi's testimony that she entered into the Agreement in good faith, believing that there were no further disciplines on Plaintiff's record. Potter's Memorandum at 17-18. Potter further argues that Plaintiff cannot show that the Union acted arbitrarily or in bad faith by concealing the Agreement from Plaintiff, as there has been no evidence submitted to show that the Union intentionally concealed the Agreement, with full knowledge that the Agreement would adversely affect Plaintiff. Potter's Memorandum at 18 (citing Lewis v. Tuscan Dairy Farms, Inc., 25 F.3d 1138, 1142-43 (2d Cir. 1994)).

The Union presents three arguments in its Memorandum to show that the Union did not breach its duty of fair representation. First, the Union argues that at most, Plaintiff can show that any failure by Yannuzzi to conduct a further investigation of Plaintiff's disciplinary history amounts to negligence, which is not sufficient to establish a breach of the duty of fair representation. Union's Memorandum at 10-16. Second, the Union argues that the Union's failure to obtain Plaintiff's consent prior to entering into the Agreement does not, as matter of law, amount to a breach. Union's Memorandum at 16-17. Finally, the Union argues that Plaintiff's claim that the Union breached its duty by misinforming Plaintiff that the LOW had been expunged from his file is without merit, as Plaintiff has not shown that this supposed misrepresentation had any effect on the outcome of the arbitration of the seven day grievance. Union's Memorandum at 17-20.

I will address each of Plaintiff's claims seriatim. First, Plaintiff's claim that the Union breached its duty of fair representation by entering into the Agreement without his knowledge and consent is meritless. It is undisputed that the CBA does not require a representative of the Union to consult with the grievant prior to settlement. See supra at note 2. In addition, as a matter of

law, a union representative's failure to keep a grievant informed of the status of his or her grievance is not a breach of the duty of fair representation.  Caputo v. National Assoc. of Letter Carriers, 730 F.Supp. 1221, 1230 (S.D.N.Y. 1990) (citations omitted).  "A union does not act unfairly when if [sic] fails to consult with or advise a grievant of its bargaining activities [], nor in the legitimate exercise of its discretion, need it obtain the employee's consent before settling a grievance."  Id. (citations omitted).

Second, Plaintiff's claim that the Union breached its duty of fair representation by misinforming Plaintiff regarding the status of the LOW is without merit.  Before I address whether the Union's actions constituted a breach, I note that Plaintiff's allegation that he was "reassured" by local and national union representatives that "the LOW was removed from his file with no restrictions[]" is, at best, an extremely liberal interpretation of what was actually communicated to Plaintiff.  In the Complaint, Plaintiff claims that the Union, through its agents, advised Plaintiff that his "LOW has been expunged and removed from his personnel file." Complaint at ¶ 11.  At his deposition, when Plaintiff was asked which agents told him that his LOW had been expunged, and he responded that Arlene McDuffie ("McDuffie") and Rita Patrick ("Patrick"), representatives from Plaintiff's local union (the "Local") and Union agents Yannuzzi and Frank Finelly ("Finelly"), told him that the LOW was "removed from [his] file."[5]  Plaintiff's Deposition at 206-207.  However, I find that there is nothing in the record, including Plaintiff's own deposition testimony, to show that any of the aforementioned representatives told Plaintiff that the LOW was expunged and removed from his personnel file.  More accurately, Plaintiff was

_____

[5] Plaintiff conceded that none of the agents used the word "expunged."  Plaintiff's Deposition at 207.

consistently told that the LOW could not be located in his file.[6]

Additionally, it is confusing why Plaintiff believed that the LOW was expunged from his file when no one told him that the LOW was resolved in his favor.  On the contrary, Plaintiff testified that he was aware that the LOW was pending, and that he was awaiting arbitration.  To illustrate, in December 2002, when Patrick informed Plaintiff that his request to dismiss the LOW at Step Two was denied, he informed Patrick that he wished to proceed to arbitration, rather than settle the LOW grievance.[7]  Plaintiff's Deposition at 75-78.  Plaintiff further testified that Patrick told him the LOW would be "pending" until arbitration.  Plaintiff's Deposition at 79.  Plaintiff further testified that from his conversation with Patrick, he understood "pending" to mean that the LOW would be removed from his file.  Plaintiff's Deposition at 79.  Moreover, the 7-Day Notice and the 14-Day Notice clearly state that the LOW was considered in issuing the more progressive forms of discipline.  Waszmer.Decl. at Exhibit G (7-Day Notice); Escalante.Decl. at Exhibit L

---

[6] In his Opposition, Plaintiff cites to pages 85, 104, 112-114, 157, 164, and 201 of his deposition transcript to lend support to his statement that representatives from the Local and the Union repeatedly told him, from Spring 2003, until December 2004, that the LOW was expunged and from his personnel file "with no restrictions."  Plaintiff's Opposition at 8.  My review of the relevant pages of Plaintiff's Deposition shows that on pages 85, 104, 112-113, and 201 Plaintiff testified regarding a conversation he had with McDuffie after he received the 14-Day Notice.  See Plaintiff's Deposition.  Plaintiff further testified during that conversation, McDuffie, at Plaintiff's request, looked for the LOW in Plaintiff's file with the Union and with Management, and that she did not find the LOW in either file.  Id.  Additionally, on page 157, Plaintiff testified that in April 2002, he received a letter of warning that was "dropped" when he proved that he was not guilty of the charge.  Id.  Finally, on page 164, Plaintiff testified that in the summer of 2003, he asked Patrick about the status of the LOW, and according to Plaintiff, she said that it was not in his file.  Id.

[7] In December 2002, Patrick informed Plaintiff that his request to dismiss the LOW grievance at Step Two was denied, and that management had offered to settle the LOW grievance by keeping the LOW in Plaintiff's file for nine months.  Plaintiff's Deposition at 76. Plaintiff told Patrick that he did not want to settle the LOW grievance because he believed he was "being penalized for something that [he] didn't do."  Id. at 77.

(14-Day Notice).

In sum, that Plaintiff believed the LOW was removed from his personnel file before it had been resolved appears to be more of a misunderstanding on Plaintiff's part rather than a deliberate attempt by the Union to deceive Plaintiff.  Even assuming that Plaintiff was justified in believing that the LOW was expunged from his file, he has not submitted sufficient evidence to create a genuine issue of material fact whether the Union intentionally misled Plaintiff with regard to the status of the LOW, or made the supposed misrepresentations to Plaintiff in bad faith.  Therefore, Plaintiff's first two claims do not establish the existence of a genuine issue of material fact whether the Union breached its duty of fair representation.

With respect to Plaintiff's third claim, the issue before the Court is whether, as a matter of law, Yannuzzi's failure to conduct a more thorough investigation of Plaintiff's disciplinary history prior to entering into the Agreement rises to the level of a breach of the duty of fair representation.

Here, Plaintiff claims that Yannuzzi's cursory review of his grievance file and the GATS database creates a genuine issue of material fact whether Yannuzzi handled Plaintiff's LOW grievance in an arbitrary and perfunctory manner.  Plaintiff further claims that Yannuzzi cannot argue that her decision to sign the Agreement was rational, based on her good faith belief that Plaintiff had not incurred subsequent disciplines, because Yannuzzi had failed to "follow any meaningful means to ascertain" whether Plaintiff had further entries on his disciplinary record.  Plaintiff's Response to the Union's 56.1 Statement at ¶ 14.  The Defendants argue that there is no genuine issue of material fact whether Yannuzzi's failure to conduct a more thorough investigation of Plaintiff's disciplinary history before entering into the Agreement constitutes a breach of the duty of fair

representation.  At most, the Defendants argue, Yannuzzi's conduct is negligent, and does not rise to the level of a breach.

It is undisputed that on April 11, 2003, Management made an offer to settle the LOW grievance by promising to expunge the LOW if, after one year from the date the LOW was issued, Plaintiff did not incur further disciplinary action.  Supra at 6.  It is also undisputed that it was Yannuzzi's practice to refer to GATS when she handled settlement proposals that made expungement of a discipline contingent on receiving no further disciplinary actions for a period of time.  Supra at 6-7.  Yannuzzi further testified at her deposition that she had relied on GATS for fifteen years and had never had a problem prior to settling the LOW grievance.  Yannuzzi Deposition at 31 and 52.  However, Kirk testified at his deposition that not all disciplines are entered into the GATS system.  Kirk Deposition at 53.  In fact, only grievances that have progressed to Step Two are entered into the GATS system; thus, a grievance that is still at Step One would could not be searched in GATS.  Kirk Deposition at 53.  Although it is unclear from the record whether Yannuzzi was aware that a union employee's complete disciplinary history would not necessarily be recorded in GATS, it is clear that she did nothing but refer to GATS to confirm whether Plaintiff had received a discipline after filing the LOW grievance.  Yannuzzi Deposition at 21; see also Yannuzzi Deposition at 14, 16, and 31.

It is well-established that as part of the duty of fair representation, a union " 'may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion.' "  Gold, 758 F.Supp. at 207 (citing Vaca, 386 U.S. at 191).  However, "such 'grievance processes cannot be expected to be error-free,' and [] a showing of mere negligence or errors in judgment is insufficient to sustain a plaintiff's burden of showing that his [or her] union breached its duty of

19

fair representation." Giordano v. Local 804, 634 F.Supp. 953, 956 (S.D.N.Y. 1986) (citing Hines, 424 U.S. at 570-71) (other citation omitted).  In addition, whether the Union's decision to enter into the settlement was arbitrary must be viewed "in light of the legal landscape at the time of the settlement."  O'Neill, 499 U.S. at 79.

Applying this standard to Plaintiff's claim, I find that a reasonable finder of fact could conclude that it was irrational for Yannuzzi, the Union's representative, not to conduct further due diligence prior to agreeing to a settlement proposal that only benefitted Plaintiff if he received no further disciplinary actions.  I emphasize that this finding is based on Yannuzzi's alleged cursory review of Plaintiff's file and disciplinary history prior to settling the LOW, and not on Plaintiff's allegation that Yannuzzi entered in the Agreement in bad faith, knowing that the Agreement would harm Plaintiff.  However, "the role of the district court 'is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.' " Gold, 758 F.Supp. at 209 (citing Anderson, 477 U.S. at 242).  Therefore, considering the evidence before the Court in the light most favorable to Plaintiff, I find that it cannot be determined as a matter of law whether the Union's failure to conduct additional due diligence prior to accepting the terms of the Agreement was irrational.  See Gold, 758 F.Supp. at 208-209 (union's decision to withdraw its notice of intent to arbitrate, based only on a cursory review of the grievant's file, presented a genuine issue of material fact).

However, in order to prevail on the Motions, Plaintiff must show that there are genuine issues of material fact with respect to both prongs of his hybrid claim.  Although the breach of the duty of fair representation is a prerequisite to establishing a hybrid claim, "the converse is also true – that is, in a hybrid claim, if the employer is not liable to the employer then neither is the

union." <u>Acosta</u>, 410 F.Supp.2d at 309 (citing <u>DelCostello</u>, 462 U.S. at 165).  Plaintiff claims that

his Employer breached the CBA by issuing the LOW to Plaintiff without just cause.  The

Defendants argue that they are entitled to summary judgment because it is undisputed that

Plaintiff disobeyed the direct orders of his supervisors on November 9, 2002, and that the Postal

Service issued the LOW due to Plaintiff's disobedience, in accordance with Article 16 of the

CBA.  Potter's Memorandum at 13-14; Union's Memorandum at 22.

It is undisputed that on November 11, 2002, the Postal Service issued the LOW to

Plaintiff.  Complaint at ¶ 10; Union's 56.1 Statement ¶ 10.  The LOW charged Plaintiff with:  (1)

failure to follow instructions; and (2) leaving his assigned work area without permission during

his shift on November 9, 2002.  Waszmer.Decl. at Exhibit C; Cover Deposition at 49.

Specifically, the LOW stated that "at 7:15 a.m. [Plaintiff] left [his] assigned DBCS machine prior

to finalizing all of the mail. . . . [Plaintiff] did not notify a supervisor prior to leaving the

operation, and instead, [Plaintiff] left [his] assigned work area without permission."

Waszmer.Decl. at Exhibit C; Cover Deposition at 51.  The parties also do not dispute that the

CBA provides for progressive forms of employee discipline, and that a letter of warning is the

least severe form of discipline that can be issued to an employee.  <u>Supra</u> at 3.

Additionally, there is no dispute of fact that at the time Plaintiff incurred the LOW, he was

employed by the Postal Service in the capacity of a part-time flexible mail processor.  <u>Supra</u> at 2.

As a part-time employee, it was mandated that Plaintiff be "assigned to regular schedules of less

than forty (40) hours in a service week, or shall be available to work flexible hours as assigned by

the Employer during the course of a service week."  <u>Supra</u> at 3; <u>see</u> <u>Hein v. Potter</u>, 271 F.Supp. 2d

545, 548 (S.D.N.Y. 2003) (defining a part-time flexible postal employee as a "permanent postal

employee who is not guaranteed a 40-hour work week or a consistent schedule.") (citing <u>Shiring v. Runyon</u>, 90 F.3d 827, 829 (3d Cir.1996)).  Moreover, at his deposition, Plaintiff testified that employees assigned to the DBCS machines, such as Plaintiff, were required to ask for permission from a supervisor if they could not stay past the end of the regular shift to "finalize" the mail.  <u>Id.</u> at 56.  According to Plaintiff, "finalizing" the mail means that the mail must have been: (1) automated through the DBCS machine; (2) swept out of the machine and placed into trays; and (3) loaded onto postal containers, ready to be loaded onto a delivery truck.  <u>Id.</u> at 63.

Plaintiff further testified that on November 9, 2002, he wanted to leave at 7:30 a.m. to pick up his nephew.[8]  Plaintiff's Deposition at 52-55.  Because Plaintiff anticipated that the mail would not be finalized until after 7:30 a.m., the end of his regular shift (Plaintiff's Deposition at 57), he "informed" his supervisor Danielle Bland ("Bland") that he was going to leave at 7:30 a.m. to pick up his nephew.  Plaintiff's Deposition at 55-56.  However, neither Bland, nor Plaintiff's other supervisor Ruben Gonzalez ("Gonzalez"), gave Plaintiff permission to leave before his mail was finalized.  <u>Id.</u> at 58.  Indeed, Plaintiff testified that Bland explicitly told him that he was not to leave until his mail was finalized, and in response Plaintiff attempted to further explain his reason for wanting to leave.  <u>Id.</u> at 57-58.  Bland then told Plaintiff in no uncertain terms that if he left without permission, she would take disciplinary action against him.  <u>Id.</u> at 58.  Plaintiff testified that he understood that he did not have permission to leave at 7:30 a.m.  <u>Id.</u> at 59.  However, at approximately 7:20 a.m. on the day in question, Plaintiff informed Gonzalez that

---

[8] Plaintiff testified that his nephew called him at work at approximately 6:15 a.m. to tell Plaintiff he was not feeling well.  Plaintiff's Deposition at 52.  Plaintiff further testified that he was in the processing of adopting his nephew and considered him his son.  <u>Id.</u>  At the time of the call, the nephew was at his grandmother's house, and his illness evidently did not require medical attention.  <u>Id.</u> at 54-55, 59.

he was leaving, he punched out, and then he left the Westchester Facility.  Id. at 61-62.

Moreover, although Plaintiff claims that he "finalized [his] portion of the mail" before he left (Id.

at 63), he admitted that he left his DBCS machine before the mail had been finalized:

> Q:    . . . So at time [sic] your partner came back and you left the DBCS machine, the mail was not finalized but it had been processed.
> A:    Right.
> Q:    So correct me if I'm wrong.  What remained to be done by either you or Mr. [sic] Rivera was to load the mail into the trays and load the trays into the post con?
> A:    Correct.
> Q:    So by the time you left that had not been done.
> A:    Yes.

Id. at 65-66.

Plaintiff "vehemently denies" that he failed to follow instructions, or that he left his

assigned work area without permission during his shift on November 9, 2002.  Plaintiff's

Opposition at 11.  However, Plaintiff offers no additional evidence to support his denial.  In fact,

his own deposition testimony unequivocally shows that he blatantly disobeyed the orders of his

supervisors by leaving work early without permission.  See above paragraph.  In a motion for

summary judgment, "[t]he non-moving party may not rely on mere conclusory allegations nor

speculation, but instead must offer some hard evidence showing that its version of the events is

not wholly fanciful."  D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1997) (citing

Podell v. Citicorp Diners Club, 112 F.3d 98, 101 (2d Cir. 1997) (other citations omitted).  In

addition, the " 'mere existence of a scintilla of evidence' supporting the non-movant's case is []

insufficient to defeat summary judgment."  Niagra Mohawk Power Corp. v. Jones Chemical, 315

F.3d 171, 175 (2d Cir. 2003) (citing Anderson, 477 U.S. at 252).  Based on the foregoing, I find

that Plaintiff has failed to show that there is a genuine issue of material fact to be tried regarding

his claim that the Postal Service issued the LOW without just cause.  Accordingly, I find that the

Motions should be granted on this ground.

In his Opposition, Plaintiff also argues that the Motions should be denied as against the Postal Service because his Employer issued the LOW in retaliation for Plaintiff filing an EEO complaint against Bland, and that his Employer singled him out for discipline while tolerating similar behavior from other similarly situated employees. Plaintiff's Opposition at 11. Specifically, Plaintiff contends that he has "continuously maintained that the LOW was issued by his Supervisors for discriminatory reasons and in bad faith." Plaintiff's Opposition at 2. Additionally, Plaintiff asserts that "[t]he record is clear" that Plaintiff filed an "internal agency discrimination complaint" against Bland on October 3, 2002, and that there is a "causal connection" between the filing of his EEO complaint against Bland and the issuance of the LOW. See Plaintiff's Opposition at 11 (Plaintiff fails to cite to the "record" or any other source).

However, Plaintiff has never alleged discrimination claims, including a claim of retaliation, against his Employer until he filed his Opposition to the Defendants' Motions. Contrary to Plaintiff's claims in his Opposition, he did not raise claims of discrimination in the Complaint. To illustrate, in the Second Cause of Action against his Employer, Plaintiff vaguely states that the "Defendant Employer breached its employment Agreement with Plaintiff, when in November 2002, it wrote him up in bad faith, and for no just cause." See Complaint at ¶ 30. Nowhere in the Complaint does Plaintiff allege that the Postal Service discriminated against him by retaliating against him or subjecting him to disparate treatment. See Complaint at ¶¶ 31-39. Even under the liberal pleading standard set forth in Fed. R. Civ. P. 8(a), Plaintiff failed to " 'give the [Defendants] fair notice of what [Plaintiff's] claim is and the grounds upon which it rests.' " See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) (citing Conley v. Gibson, 355 U.S.

24

41, 47 (1957)).  Therefore, I find that Plaintiff cannot successfully oppose the Motions by raising

claims that were not alleged in the Complaint.

In any event, Plaintiff cannot avoid summary judgment based on a conclusory allegation

of retaliation and disparate treatment.  See supra at 23.  To establish a prima facie case of

retaliation, a plaintiff must show:  (1) participation by the plaintiff in a protected activity; (2) an

employment action disadvantaging the plaintiff; and (3) a causal connection between the

protected activity and the adverse employment action.  Slattery v. Swiss Reinsurance America,

248 F.3d 87, 94 (2d Cir. 2001) (citations omitted).  Here, assuming arguendo that Plaintiff filed

an EEO complaint against Bland in October 2002, Plaintiff could satisfy the first element of the

prima facie case.[9]  It can also be argued that Plaintiff has also satisfied the second element, as the

LOW could be considered an adverse employment action.

However, the only support Plaintiff offers for his claim that there is a "causal connection"

between his filing of the EEO complaint and the issuance of the LOW, is the conclusory

statement that he "viewed this discipline as a retaliation for filing an EEO Complaint."

Cover.Decl. at ¶ 8.  Plaintiff fails to submit any evidentiary support for his claim.  Moreover, the

evidence that is before the Court, especially Plaintiff's deposition testimony, shows that Bland

was justified in disciplining Plaintiff for his behavior on November 9, 2002.  Plaintiff appears to

base his claim of retaliation solely on the fact that the LOW was issued approximately one month

after he said he filed the EEO complaint.  See Plaintiff's Opposition at 11.  However, even if it

could be shown that the LOW was issued two days after Plaintiff filed the EEO complaint,

_____

[9] In his Declaration, Plaintiff stated that he lodged an EEO complaint of discrimination
against Bland.  Plaintiff.Decl. at ¶ 7.  Plaintiff did not provide further testimony or other
documentary evidence to confirm the existence of the EEO complaint.

closeness in proximity of time, alone, is insufficient to establish the required causal connection in a retaliation claim.  See Griffin v. Ambika Corp., 103 F.Supp.2d 297, 312 (S.D.N.Y. 2000) (citations omitted).  Thus, Plaintiff cannot defeat summary judgment by claiming that the Postal Service retaliated against him.

In addition, Plaintiff's claim that he was singled out for discipline and subjected to unequal treatment also would not defeat summary judgment.  The only support Plaintiff offers for his vague claim is an unsworn statement by Patrick stating that a co-worker of Plaintiff's named "Henry" was not required to "stay overtime" and "was not disciplined."  Escalante.Decl. at Exhibit 2.  Aside from the fact that Patrick's unsworn statements are inadmissible, the document sets forth no credible evidence from which a reasonable person could conclude that the Postal Service singled Plaintiff out by issuing him the LOW, treating him differently than other similarly situated employees.

Therefore, I find that as a matter of law, the Postal Service did not breach the CBA, and therefore, the Motions are granted in favor of Potter.  Moreover, in a hybrid action, Plaintiff cannot proceed against the Union unless he also has a viable cause of action against his Employer.  See supra at 11 and 20.  Thus, I further find that the Motions are granted in favor of the Union.

## III.    CONCLUSION

For the reasons set forth above, the Motions for Summary Judgment filed by Potter and the

Union respectively, are granted, and the Complaint is therefore dismissed in its entirety.

Dated:        July 21, 2006
              White Plains, New York

**SO ORDERED**

Lisa Margaret Smith
United States Magistrate Judge
Southern District of New York

27